UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
:
LISA DEMARCO,                          :     04 Civ. 0440 (RJH)
:
               Plaintiff,    :
:
   -against-                          :     **MEMORANDUM OPINION**
:     **AND ORDER**
:
TIMOTHY OUELLETTE, et al.,             :
:
               Defendant.    :
:
------------------------------------------------------------x

      This personal injury action is brought by plaintiff Lisa DeMarco against individual defendant Timothy Ouellete, and corporate defendants The Culture Club NYC, Inc. (the "Culture Club, Inc.") and The Culture Club NYC, LLC (the "Culture Club"). Plaintiff has voluntarily dismissed[1] all claims against Ouellete and the Culture Club, Inc., leaving only defendant Culture Club, which owns a nightclub by the same name on Varick Street in New York City. While patronizing that nightclub on the evening of June 20-21, 2003, plaintiff suffered a fractured ankle when an unidentified male patron fell on her. Plaintiff now claims that the Culture Club is responsible for her injury because it (i) negligently failed to remove the unidentified male from its premises prior to the accident; (ii) operated an inherently dangerous "tiered" dance floor; (iii) negligently allowed the club to become overcrowded; and (iv) violated New York's Dram Shop Act. Defendant

---

[1] In her response to defendant's motion for summary judgment, plaintiff acknowledges that Ouellete, as a member of a limited liability corporation, is protected by the fiduciary shield doctrine, and that the Culture Club, Inc. is not an active corporation. (Pl. Opp. Memo., pp. 5-6). For these reasons, plaintiff asks that all claims against these defendants be voluntarily dismissed. The Court now does so.

Culture Club has moved for summary judgment on all claims. For the reasons set forth below, that motion is granted.

**I.      Background**

The following facts are taken from the parties' Rule 56.1 statements, affidavits and depositions. Unless otherwise noted, they are not disputed. On the evening of June 20, 2003, plaintiff and a friend, Gina Giarratana, arrived at the Culture Club between 9 and 11 o'clock (Deposition of Lisa DeMarco, p. 22 ("DeMarco Dep.")). Both had been to the Club on several previous occasions. As the evening wore on, the two danced and socialized, consuming approximately two drinks each between the time they arrived and 2 a.m. the next morning. There is no evidence that plaintiff was intoxicated when she arrived at the Club, and plaintiff testified that she remained sober throughout the evening, most of which she spent with Giarratana on the Club's "tiered" dance floor. (DeMarco Dep., p. 41).

The "tiered" nature of the dance floor can be described as follows. There is a "bottom" level, which is flush with the main floor of the club, but readily distinguishable by embedded lights. (DeMarco Dep., pp. 45-46). This bottom level is roughly square, is constructed of wood, and can accommodate approximately 40-45 dancers. (DeMarco Dep., pp. 28-32, 46; October 12, 2003 Dep. of Luis Vega, p. 18 ("Vega Dep.")). Sitting on top of the bottom level, and entirely contained within it, is a "second" level. (*Id.*). Relative to the bottom level, this second level is significantly smaller in square footage – it can accommodate between 15 and 25 people – and is reached by climbing a step of approximately one foot. (Vega Dep., p. 17). Like the bottom level, the second level is "lit up", and is otherwise distinguished by a colored band running its perimeter.

(DeMarco Dep., p. 46; Vega Dep., p. 17). The "third" or "top" level sits on top of the second level, and is similarly constructed, with a light-colored band running its perimeter. (*Id*.). It has the smallest square footage of the three levels, and can hold approximately 6 people. (*Id.*).

Plaintiff's injury occurred on the second level of the dance floor in the following manner. According to plaintiff, she and Giarratana were dancing just after 2 a.m. when an unidentified male patron bumped into her, causing her to lose her balance and fall straight back. (DeMarco Dep., p. 55). Plaintiff testified that when she landed on the ground, her legs were beneath her as if she was "kneel[ing] down on the floor," with the top of her feet facing down. (*Id.*, pp. 55-59). In a sort of "domino" reaction, the unidentified patron also fell down, landing on top of plaintiff with her left leg still trapped under her. Plaintiff's ankle fractured under the added weight. (*Id.*). Realizing that she had been seriously injured, plaintiff yelled for the man to get off her, which he did without delay. (*Id.*).

There is no dispute that plaintiff's injury was accidental. Plaintiff remembered that between six and eight people fell at the same time she did, including Giarratana. (*Id.*, p. 61). Although plaintiff considered the dance floor to be crowded at the time she fell, so much so that "you [couldn't] see where the [tiers] end[ed]", (*Id.*, p. 64), plaintiff didn't see anyone push, shove, or attack the man who fell on her. (*Id.*, pp. 58, 65). Neither had there been any previous contact that evening between plaintiff and the male patron; plaintiff did not talk to him prior to the accident, and had no recollection of how long he had been at the club that night. (*Id.*, p. 63).

In an affidavit signed on December 16, 2004, Giarratana provided a somewhat different perspective on the accident. ("First Giarratana Aff."). She agreed with plaintiff that "[t]he . . . Club seemed overly crowded" at the time of the accident, but added that there "seemed to be a lack of control by the bouncers and security, especially control over [the] crowd from which the [unidentified] male patron . . . fell and crushed [plaintiff's] left ankle." (First Giarratana Aff., ¶ 5). This observation is subject to some dispute. A member of the Club's security staff, Luis Vega, remembered that the crowd was "sparse" at the time of the accident, at least as compared to a "crowded" night, when there could be between 700 and 800 people at the Club and as many as 18 members of the security staff working. (Vega Dep., pp. 13, 16, 21, 27). Although there is no way to tell exactly how many people were in the Club at the time of the accident, a second member of the Club's security staff, Judith Caserta, supported Vega's opinion, explaining during her deposition that the crowd was "movable" (apparently an indication of its controllable, and therefore small, size), and also remembering that she was able to reach plaintiff "immediately" after the accident. (October 22, 2004 Dep. of Judith Caserta, p. 31 ("Caserta Dep.")). As explained more fully, *infra*, the Court need not resolve this issue.

In any case, Giarratana's first affidavit offers an additional explanation for the accident, noting that it occurred after "a shoving match, or fight, going on immediately before the [unidentified] male patron" fell on plaintiff. (First Giarratana Aff., ¶ 5).[2] Giarratana expanded on this observation in a second affidavit signed on January 27, 2005 ("Second Giarratana Aff."), where she notes that she "remember[ed] seeing [the male

---

[2] Caserta backed up this portion of Ms. Giarratana's account, noting during her deposition that plaintiff fell after being bumped by "a bunch of gentlemen that were kind of roughhousing." (October 22, 2004 Dep. of Judith Caserta, p. 18 ("Caserta Dep.")).

4

patron] prior to the injury . . . at the bar having alcoholic drinks." (Second Giarratana Aff., ¶ 5(c)). It was also her opinion that "[t]his man and his friends were evidently intoxicated on the dance floor in proximity to . . . plaintiff", a claim she supports by noting that the man had a "disheveled appearance" and was behaving "abhorrent[ly]" at the time of the accident. (*Id.*). According to Ms. Giarratana, despite this behavior, "[n]o action was taken by Club employees against this male patron prior to the incident." (*Id.*, ¶ 5(d)). This evidently surprised her, although there is no evidence that either she or plaintiff complained of roughhousing, or visibly intoxicated patrons on the night of the incident. (DeMarco Dep., p. 108).

Whatever its exact cause, after the accident plaintiff was escorted outside by Giarratana and two employees of the Club, Luis Vega[3] and Judith Caserta.[4] On the night in question Vega was working the Club's main floor, where he was able observe most of the dance floor, including the site of the accident. (Vega Dep., p. 10). Although he was unable to describe plaintiff's fall in any detail, he was one of the first Club employees on the scene, and remembered helping another Club employee, Judith Caserta, "pick[] up" plaintiff after the fall and escort her out of the club. (*Id.*, pp. 10, 20; Caserta Dep., p. 21). Like Vega, Caserta was a member of the Club's security staff, where she worked as a

---

[3] Vega was hired in February 2003 as "security" for the Club, a position he still held as of the date of his deposition, October 12, 2004. (Vega Dep., p. 5). Vega testified that the Club provided him with some training – in the form of an employment manual – and that he had completed eight and sixteen-hour security courses, and had therefore been "certified" in security, prior to his employment with the Club. (*Id.*, p. 6). Vega also testified that he had worked in several other nightclubs before starting, and that he had about ten years' experience in the industry. (*Id.*, pp. 15-16).

[4] Although Caserta was also on the Club's security staff, unlike Vega she testified that she received little or no on-the-job training, except that the Club's management apparently talked to her about "procedures regarding fights". (Caserta Dep., pp. 9, 28).

5

liaison for female patrons in need of assistance, whether because they were intoxicated or otherwise. (*Id.*, pp. 8-9). It was in this role that she assisted plaintiff outside.[5]

Once Vega and Caserta had removed plaintiff from the Club, Caserta asked her to sign an "incident report". The incident report contains a description of the accident, as well as observations of plaintiff's subsequent behavior. According to Caserta, Giarratana provided the accident description, (Caserta Dep., p. 27), which can be found under the heading "Claimant's description of incident in detail", and notes that "[claimant was] pushed by other customers and slipped on [the] dance floor causing her ankle to get hurt." (Incident Report, attached as Ex. F to Cresci Verification). A similarly succinct statement appears just above, under the heading "Nature of Injury", where the report notes that plaintiff was "knocked over by other customers [and] hurt [her] ankle." (*Id.*). Although plaintiff signed just below both descriptions, at her deposition she disputed the proposition that she "slipped". (DeMarco Dep., p. 75).

The report also contains a section for staff comments. Under the heading "Employee's Description of Incident in Detail", Caserta wrote that "while interviewing [plaintiff] she appeared to be extremely intoxicated and slur[red] [her] words." (Incident Report, attached as Ex. F to Cresci Verification). Vega's comments support this observation, and also allude to a second reason plaintiff fell, namely, "because she was wearing open heel[ed] shoes." (*Id.*). As noted, *supra*, plaintiff vehemently denies that she was intoxicated at the time of her fall; she also testified that her shoes had nothing to

---

[5] Although Caserta's principal role was as a Club liaison, she also occasionally "worked the door", which meant "clicking" in customers as they entered, apparently using some sort of a hand-held counting device. Caserta noted that on a busy night, she would click anywhere from 900 to 1300 people into the Club. (*Id.*, pp. 15-16). She also testified that running occupation totals were kept every evening in an effort to keep the crowd within the Club's capacity limit of 710 people. (*Id.*, p. 16; Certificate of Occupancy, Ex. L to Cresci Verification).

do with the accident. (DeMarco Dep, pp. 75-78). By contrast, both Vega and Caserta reaffirmed their comments at their depositions. Vega testified that when he helped plaintiff outside, he remembered her to be "slurring out words and walking off balance, not walking normal." (Vega Dep., p. 10). Caserta testified that, although plaintiff was intoxicated on the night of the accident, she was not removed from the Club because "it is very hard to pinpoint every intoxicated" customer, and in any case plaintiff was not "badly stumbling" or a "troublemaker". (Caserta Dep., p. 25).

Whatever the exact nature of plaintiff's mental state at the time of the accident – and the Court need not resolve that question – it is clear that approximately thirty minutes after plaintiff was escorted out of the Club, Giarratana drove her to a hospital in Bayonne, New Jersey. (DeMarco Dep., p. 79).[6] Hospital records show that plaintiff checked in to the emergency room at 3:07 a.m. (First Giarratana Aff., ¶ 6; Emergency Department Form, attached as Ex. G to Cresci Verification). They also indicate that an x-ray was taken at about the same time, and that plaintiff was diagnosed with an oblique fracture to her left anklebone. After being told that the injury would require surgery, plaintiff was admitted to the hospital. (Radiology Report, attached as Ex. G to Cresci Verification). Surgery was performed the next afternoon, during which pins and plates were placed on the ankle. (DeMarco Dep., p. 81).

Plaintiff now brings this lawsuit to recover for her injuries.

---

[6] This directly conflicts with Caserta's testimony that plaintiff "headed back inside the club and continued her evening" after recovering from the injury. (Caserta Dep., p. 36). In light of hospital records showing plaintiff's 3:07 check-in, it is clear that she did not return to the club – for any length of time, if at all – after injuring herself. The Court will therefore disregard this portion of Caserta's deposition.

7

## II. Discussion

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Similarly, summary judgment should be granted if, "after adequate time for discovery," the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In deciding whether a genuine issue of a material fact exists, a Court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir. 1993) (citations omitted).

Keeping these principles in mind, the Court will consider plaintiff's claims in order, beginning with her claim that the Culture Club was negligent, either because it failed to adequately control its patrons, maintained an inherently dangerous dance floor, or allowed the club to become overcrowded. The Court will then separately consider plaintiff's Dram Shop Act claim. The parties have agreed that New York law applies to all claims.

### A. Premises Negligence

Like any other property owner, defendant Culture Club has a duty to control the conduct of guests on its premises. *D'Amico v. Christie*, 71 N.Y.2d 76, 85 (1987) ("Landowners in general have a duty to act in a reasonable manner to prevent harm to those on their property"). But this duty is limited in several important respects; first to conduct that it has the opportunity to control and of which it is reasonably aware,

8

*Marianne OO v. C & M Tavern, Inc.*, 180 A.D.2d 998, 1000 (N.Y. App. Div. 3rd Dept. 1992); and second, to conduct that is foreseeable or expected. *Woolard v. New Mohegan Diner,* 258 A.D.2d 578, 579 (NY. App. Div. 2nd Dept. 1999) (no duty "to protect patrons against unforeseeable and unexpected assaults"). In this case, there is no doubt that the Club had the opportunity to control the patron who injured plaintiff. This means that the Club's duty to plaintiff, if any, will turn on (i) its awareness of the conduct that caused her injury; and (ii) the predictability of the accident. Plaintiff, of course, contends both that the Club was aware of the impending danger, and that the accident was entirely foreseeable.

Having carefully reviewed the record, the Court disagrees. To begin, there is no basis for plaintiff's claim that the Club was "reasonably aware" that the male patron who injured her was a risk to other customers, whether because he was intoxicated or otherwise. *Garofalo v. Henrietta Italia, Inc.*, 175 A.D.2d 580, 581 (N.Y. App. Div. 4th Dept. 1991) (defendant restaurant entitled to summary judgment on negligence claim where there was no evidence prior to an altercation that the patron who caused plaintiff injury posed a threat). For example, it is undisputed that neither plaintiff nor Giarratana alerted the Club to the fact that the patron was behaving erratically, even assuming that he was. This both undercuts Giarratana's observation that the man was behaving "abhorrent[ly]" and distinguishes this case from those where New York courts have found awareness on the a basis of a customer complaint. *See, e.g., Butler v. E.M.D. Enterprises, Inc.*, 689 N.Y.S.2d 575, 576 (N.Y. App. Div. 4th Dep't 1999) (risk of harm to tavern patron was reasonably foreseeable where patron had earlier informed tavern employees that she had been threatened, and that she was fearful of being assaulted).

Neither is there any evidence that the Club should – or indeed, could – have been independently alerted to the patron's allegedly dangerous propensity. For example, there is no evidence that other customers complained about the male patron on the night in question, or more generally about the conditions at the Club. *Cf. Dollar v. O'Hearn*, 248 A.D.2d 886, 887 (N.Y. App. Div. 3rd Dept. 1998) (plaintiff's testimony that hotel guests were boisterous and rowdy was sufficient to raise question of fact as to whether defendants should have been aware of potentially dangerous situation existed). Nor is there evidence that the Club had been the site of similar accidents, or any other dangerous activity, at any point in the past. *Stevens v. Spec Inc.*, 224 A.D.2d 811, 813 (N.Y. App. Div. 3rd Dept. 1996) ("While there was evidence that there had been three or four fights in the nightclub within a 10- month period prior to the evening in question, that evidence alone is insufficient to raise a material issue of fact regarding defendants' breach of duty to control its premises."). New York caselaw is clear on this point: absent awareness, there can be no duty. *Marianne OO,* 180 A.D.2d 998, at 1000; *D'Amico,* 71 N.Y.2d 76, at 85.

Moreover, by all accounts the accident occurred suddenly, which both supports the conclusion that it was not foreseeable, and calls into question what, if anything, the Club might have done to prevent it. *Lee v. Durow's Restaurant, Inc.*, 238 A.D.2d 384, 385 (N.Y. App. Div. 2nd Dept. 1997) (defendant restaurant entitled to summary judgment on negligence claim where injury caused by "spontaneous" incident). In this regard, to the extent plaintiff contends that there were insufficient security staff working on the night of her injury, she has failed to present a triable issue by neglecting to introduce expert testimony on the subject. *See, e.g., Ricard v. Roseland Amusement and*

10

*Development Corp.*, 215 A.D.2d 240, 241 (N.Y. App. Div. 1st Dept. 1995) (motion to dismiss properly granted at the close of trial where plaintiff failed to introduce the testimony of a qualified expert in the field of security, leaving the jury to speculate as to any possible deficiencies in security) (citations omitted).[7]

For all of these reasons, the Court finds that the Club did not owe plaintiff a duty to remove or control the patron who caused her injury.

### B. The Tiered Dance Floor

Plaintiff next argues that the Club was negligent because the "tiered" nature of the dance floor was inherently dangerous. There are several problems with this theory. First and most obviously, there is no expert testimony on the subject, and plaintiff's attorney is not qualified to give his opinion on the matter. *Lavine v. Town of Lake Luzerne*, 296 A.D.2d 793, 794 (N.Y. App. Div. 3rd Dept. 2002) (non-expert attorney's opinion has "no probative value"). Nor is there any independent support for the proposition under New York law. *Nelson v. Cafe Wienecke, Inc.*, 18 A.D.2d 392, 393 (1st Dept. 1963), *aff'd* 14 N.Y.2d 587 (1964) (well demarcated elevated dance floor not inherently dangerous to patron using due care); *Murphy v. Conner,* 84 N.Y.2d 969 (N.Y. 1994) (absent some specific defect, smooth but "slippery" dance floor did not present a dangerous condition).

In *Nelson*, for example, the First Department reversed a judgment in favor of a cafe patron where the patron alleged that she slipped from an elevated dance floor after her heel slipped over the edge. *Nelson*, at 392-93. Noting that the limits of the dance floor were clearly marked by a difference in color between its surface and that of the

---

[7] In any case, the Club was apparently well staffed. The record reflects that the Club employed at least 14, and as many as 18, security personnel on busy evenings, including on the night of June 20, 2003. These employees were staffed at various points throughout the establishment, including at the entrance and exits, as well as near the bars.

surrounding floor, that there were tables in very close proximity to the edge, and that there was no proof of prior accidents, the court held that while it was doubtful that the construction of the floor caused the patron's fall, even if it did, the construction did not constitute a condition of foreseeable danger to one using the floor with due care. *Id*. In this case, as in *Nelson*, there is no dispute that the dance floor was well lit and otherwise well defined at the time of plaintiff's accident; it was therefore not inherently dangerous to a person using due care.

Even setting aside these problems of proof, this claim still fails because plaintiff clearly assumed the risk of any inherent danger. In New York, the doctrine of assumed risk rests on the common sense proposition that, "by engaging in a sport or recreational activity, a participant consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport [or activity] generally and flow from such participation." *Morgan v. State*, 90 N.Y.2d 471, 484 (1997). Here, there is no dispute that plaintiff was aware that the dance floor was tiered; she had patronized the club on several prior occasions and had spent much of the evening in question on the dance floor. Under similar circumstances, where a plaintiff was aware of the condition of which he or she complained, New York courts routinely apply the doctrine of assumed risk to preclude negligence claims based on a theory of inherent danger. *See, e.g., Lisok v. Club Exit, Inc.*, 790 N.Y.S.2d 223, 223 (N.Y. App. Div. 2nd Dept. 2005) (plaintiff assumed the risk of slipping and falling on confetti on dance floor where plaintiff had knowledge of condition.); *Theodorou v. Aphis Realty Inc.*, N.Y.L.J., Feb. 3, 2004, at 2 (N.Y. Sup. Ct. 2004) (plaintiff assumed risk of slipping on flowers and paper money on dance floor where she had knowledge of the allegedly negligent condition); *LaFond v. Star Time*

*Dance & Performing Arts Center*, 279 A.D.2d 509, 509 (N.Y. App. Div. 2nd Dept. 2001) (tap dancing on slippery floor); *Nelson*, 18 A.D.2d 392, at 393 (dancing in heels on elevated dance floor). This Court will do likewise.

### C. Overcrowding

Finally, there is no evidence that the Club negligently allowed its premises to become "overcrowded". The term "overcrowding" has a specific application in New York negligence law, and requires a plaintiff to "establish that 'he [or she] was unable to find a place of safety or that his [or her] free movement was restricted due to the alleged overcrowding condition.'" *Palmieri v. Ringling Bros. & Barnum & Bailey Combined Shows,* 237 A.D.2d 589, 589 (N.Y. App. Div. 2nd Dept. 1997) (quoting *Benanti v. Port Auth. of N.Y. & N.J.,* 176 A.D.2d 549 (N.Y. App. Div. 1st Dept. 1991). Plaintiff has failed to establish either element here. Indeed, it is undisputed that she could have left the dance floor, or even the Club, at any point during the evening. These options both preclude her overcrowding claim, and preempt the dispute, noted *supra*, regarding the exact size of the Club's crowd on the night in question. The Court also notes that plaintiff has not alleged that she was injured *because* the Club was overcrowded; rather, she alleges that her injury was caused by an unruly patron.

### D. Dram Shop Act

That leaves just plaintiff's claim under New York's "Dram Shop Act", N. Y. General Obligations Law § 11-101. The Dram Shop Act "create[s] a cause of action unknown at common law by allowing recovery against a tavern owner for injuries caused as a result of [a] patron's intoxication." *Johnson v. Plotkin,* 172 A.D.2d 88, 90 (N.Y. App. Div. 3rd Dept. 1991). In particular, the statute provides that a party who unlawfully

sells alcohol to a visibly-intoxicated person is liable for injuries caused by reason of that person's intoxication. N.Y. General Obligations Law § 11-101; N.Y. Alcoholic Beverage Control Law § 65(2). Accordingly, to sustain a claim under the Dram Shop Act, a plaintiff must present some evidence that an alcohol vendor (i) sold alcohol to a patron (ii) while that patron was visibly intoxicated. *Id*. The only evidence in this case regarding the sale to or use of alcohol by the patron who injured plaintiff comes from Gina Giarratana's second affidavit.

As previously noted, Giarratana "remember[ed] seeing [the unidentified patron] prior to the injury . . . at the bar having alcoholic drinks." (Second Giarratana Aff., ¶ 5(c)). Giarratana also opined that "this man and his friends were evidently intoxicated on the dance floor in proximity to . . . plaintiff", a claim she supports by noting that the man had a "disheveled appearance" and was behaving "abhorrent[ly]" at the time of the accident. (*Id.*). This is simply not enough to present a triable Dram Shop Act claim under New York law. Even assuming that the male patron was intoxicated at the time of the accident, *and* that he had been drinking at the bar earlier in the evening, there is no evidence that he was served alcohol *while* he was visibly intoxicated, either from the bar or otherwise. *Nehme v. Joseph*, 160 A.D.2d 915, 916 (N.Y. App. Div. 2nd Dept. 1990) ("It is incumbent upon a plaintiff who charges a violation of the Dram Shop Act to offer evidence that the party to whom liquor was sold acted or appeared to be intoxicated at the time of the sale."); *cf. Dollar v. O'Hearn*, 248 A.D.2d 886, at 886-887 (denying motion for summary judgment where hotel staff placed pitchers of wine and other alcohol on tables). Absent evidence of this essential nexus, the Court must grant defendant's motion on this final ground.

### III. Conclusion

For the foregoing reasons, defendant's motion [12] is GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
September 7, 2005

_____
Richard J. Holwell
United States District

### III. Conclusion

For the foregoing reasons, defendant's motion [12] is GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
September 7, 2005

Richard J. Holwell
United States District